**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 16-cv-02773-MSK-CBS

ALLEN WILLIAMS,

    Plaintiff,

v.

RICKY MERCER, Fremont Correctional Facility medical staff, in his individual capacity;
THE ESTATE OF ROY D. HAVENS, Fremont Correctional Facility medical staff, in his individual capacity, by and through its Personal Representative, LINDA HAVENS;
JODI JOHNSON, Fremont Correctional Facility medical staff, in her individual capacity;
DONNA GUYETT, Fremont Correctional Facility medical staff, in her individual capacity;
TRUDY SICOTTE, Fremont Correctional Facility medical staff, in her individual capacity;
JOHN DOE DEFENDANTS 1-10, Fremont Correctional Facility employees, in their individual capacities;
SUPPLEMENTAL HEALTH CARE,

    Defendants.

---

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON CLAIMS THREE AND SEVEN AGAINST THE ESTATE OF ROY HAVENS**

---

Allen Williams, through his counsel Adam Frank and Faisal Salahuddin of FRANK & SALAHUDDIN LLC, moves for summary judgment against Defendant Estate of Roy Havens on claims 3 and 7 in the Amended Complaint, ECF No. 15, pursuant to Fed. R. Civ. P. 56.[1]

**BRIEF STATEMENT OF FACTS RELEVANT TO THE CLAIMS ON WHICH MR. WILLIAMS SEEKS SUMMARY JUDGMENT**

On May 14, 2015, at approximately 6:30 am, Allen Williams suffered a stroke while in custody at Fremont Correctional Facility (FCF) in Cañon City, Colorado. Defendant Havens is a

---

[1] Mr. Williams has a pending motion for leave to amend his complaint. None of the proposed amendments in Mr. Williams' proposed Second Amended Complaint affect the arguments Mr. Williams makes in this motion. Should this Court grant Mr. Williams' pending motion for leave to amend, Mr. Williams asks this Court to consider this motion as applying to claims 3 and 7 in the proposed Second Amended Complaint as well. ECF No. 56.

physician's assistant. He was the medical provider at FCF who examined and diagnosed Mr. Williams. Mr. Havens examined Mr. Williams at approximately 9:25 am and again just before 11:25 am. During these examinations, Mr. Havens documented Mr. Williams' obvious stroke symptoms, including left-sided numbness and weakness, unsteadiness walking, and slurred speech.

Mr. Havens knew these symptoms were stroke symptoms. Mr. Havens was certified in Advanced Cardiovascular Life Support (ACLS), demonstrating that he knew what stroke symptoms were and what he had to do if he observed them. Furthermore, the stroke symptoms Mr. Havens observed are commonly-known to lay people. Based on Mr. Havens' ACLS training and his common knowledge, he knew that a person suffering a stroke needs immediate medical treatment at a hospital. This is because there is one medication, tPA, which if given within hours of a stroke, can dissolve the clot causing the stroke and reverse its effects.

However, knowing that Mr. Williams was having a stroke, and knowing that Mr. Williams needed immediate treatment at a hospital for his stroke, Mr. Havens chose not to send Mr. Williams to the hospital until 30 hours after his stroke. This deliberate indifference by Mr. Havens caused Mr. Williams to have permanent, life-long physical deficits that would not be present if Mr. Havens had sent Mr. Williams to the hospital like he knew he needed to do.

Mr. Havens' deliberate indifference to Mr. Williams' serious medical need also met each element of the state tort of negligence.

## CLAIMS AND DEFENSES UPON WHICH JUDGMENT IS SOUGHT

**I.   Mr. Williams is entitled to summary judgment on claim 3: Deliberate Indifference**

    **A.   Burden of proof and elements**

Mr. Williams' third claim, brought pursuant to 42 U.S.C. § 1983, alleges deliberate indifference in violation of the Eighth Amendment based on Mr. Havens' decision to not send Mr.

2

Williams to the hospital on the morning of May 14, 2015 despite knowing Mr. Williams was suffering a stroke. To prove this claim, Mr. Williams must demonstrate, by a preponderance of the evidence, that: (1) objectively, Mr. Williams had a medical need that was sufficiently serious to be cognizable under the Cruel and Unusual Punishment Clause, (2) Mr. Havens' delay in meeting that need caused Mr. Williams substantial harm, and (3) that Mr. Havens knew about and disregarded a substantial risk of harm to Mr. Williams when he did not send Mr. Williams to the hospital. *Mata v. Saiz*, 427 F.3d 745, 752 (10th Cir. 2005).

### B. No genuine issue of material fact exists regarding the elements of claim 3

Element 1: There is no genuine issue of material fact as to whether Mr. Williams had a sufficiently serious medical need.

On May 14, 2015, Mr. Williams suffered a stroke, otherwise known as a cardiovascular accident (CVA). Exhibits G-O. The emergency room doctor who treated Mr. Williams on May 15, Dr. Ryan Christiansen, diagnosed Mr. Williams as having had an ischemic stroke on May 14. Exhibit L, p. 3. A second emergency room doctor, Dr. Timothy Bresnahan, diagnosed Mr. Williams with an ischemic stroke. Exhibit M, p. 1; Exhibit H, p. 1. The hospital internist who treated Mr. Williams after he was transferred from the emergency room, Dr. Daniel Ward, diagnosed Mr. Williams with an ischemic stroke. Exhibit G, p. 1-2; Exhibit J, p. 1. The doctor at the hospital who oversaw Mr. Williams' physical therapy, Dr. Sandra Guidry, diagnosed Mr. Williams with an ischemic stroke. Exhibit I, p. 1. The physical therapist who oversaw Mr. Williams' physical therapy, Jonathan Banker, agreed that Mr. Williams had suffered an ischemic stroke. Exhibit K, p. 1. Mr. Williams' expert neurologist, Stanford School of Medicine Professor Dr. Chitra Venkatasubramanian, diagnosed Mr. Williams as having had an ischemic stroke on May 14, 2015. Exhibit N, p. 5-6. Dr. W. Rafer Leach diagnosed Mr. Williams' as having suffered an ischemic stroke and opined that Mr. Williams' current physical deficits are consistent with him having suffered a stroke. Exhibit O, p. 4. Mr. Havens' co-defendants even identified Mr. Williams' stroke. Exhibit A, p. 145-49 (Guyett); Exhibit C, p. 84, 168-

69, 175 (Johnson); Exhibit D, p. 227-28, 234-35 (Mercer); Exhibit F, p. 184-87 (Sicotte). There is no credible evidence to support any conclusion other than that Mr. Williams suffered an ischemic stroke on May 14, 2015.

A stroke creates a sufficiently serious medical need such that it is cognizable under the Cruel and Unusual Punishment Clause of the Eighth Amendment. *See Childress v. Harms*, 449 F. App'x 758, 760 (10th Cir. 2011); *Rubin v. Hilling*, No. 1:12-cv-01842-CMA-MEH, 2013 U.S. Dist. LEXIS 48903, at *26 (D. Colo. Mar. 7, 2013); *Puskaric v. Patton*, No. CIV-15-991-HE, 2016 U.S. Dist. LEXIS 124932, at *16 (W.D. Okla. Aug. 11, 2016).

For four separate reasons, Mr. Havens' proffered expert report from Dr. Behrouz does not create a contested issue of fact regarding whether Mr. Williams suffered a stroke on May 14, 2015.

First, Dr. Behrouz evaluated whether Mr. Williams suffered a stroke under an incorrect burden of proof. Dr. Behrouz asserts that, based on the evidence presented to him, Mr. Williams cannot demonstrate that he suffered damages because there is no evidence that would "definitively prove" Mr. Williams did indeed suffer a stroke. Exhibit P, p. 11. Mr. Williams is not required to "definitively prove"[2] he suffered a stroke; Mr. Williams must only demonstrate that it is more likely than not that he suffered a stroke. Dr. Behrouz's report contains no opinion as to whether he believes the facts in this case meet the correct burden of proof. It therefore does not put the fact of whether Mr. Williams suffered a stroke in controversy.

Second, Dr. Behrouz incorrectly confines his review of facts to what he terms "concrete evidence."[3] Dr. Behrouz gives no explanation for (1) why he limited his analysis to "concrete evidence," (2) what the term "concrete evidence" means to him, (3) why the diagnoses of Drs.

---

[2] It appears from Dr. Behrouz's report that he uses the term "definitively prove" to mean a very high burden of proof, such as beyond a reasonable doubt. In any case, that term does not accurately describe the burden of proof in this case.
[3] It is unclear what "concrete evidence" means to Dr. Behrouz, as he does not appear to use the term to refer to direct evidence as opposed to circumstantial evidence.

Christiansen, Bresnahan, Ward, Guidry, and Leach are not "concrete evidence," or (4) why those diagnoses are somehow insufficient to establish the diagnosis of stroke, other than to assert that these doctors are not neurologists.[4] Dr. Behrouz cites no basis for his implicit assertion that only a neurologist can determine whether a person has suffered a stroke. This is because no such basis exists; any doctor can diagnose a stroke, and in this case, many did. *See* Exhibits G-O (offering overwhelming evidence from 8 doctors that doctors who are not neurologists can nonetheless diagnose strokes).

Third, Dr. Behrouz is only able to opine that there is not "concrete evidence" that "definitively proves" Mr. Williams suffered a stroke because counsel for Mr. Havens' estate did not provide Dr. Behrouz with the "concrete evidence" that was in counsel's possession. To reach his opinion that there is not "concrete evidence" that Mr. Williams suffered a stroke, Dr. Behrouz relied on his incorrect assumption that no neurologist looked at the imaging taken of Mr. Williams' brain. Exhibit P, p. 11. However, at the time Dr. Behrouz authored his report, defense counsel was in possession of Mr. Williams' expert neurologist report which unambiguously shows that (1) a neurologist did look at the imaging taken of Mr. Williams' brain and (2) a neurologist concluded that Mr. Williams suffered a stroke. Exhibit N.

Dr. Behrouz's incorrect assumption appears to stem from the fact that defense counsel never provided Dr. Venkatasubramanian's expert report to Dr. Behrouz. Plaintiff provided defense counsel with his expert neurologist report on July 14, 2017. Dr. Behrouz's report is dated August 2, 2017. Exhibit P, p. 1. Defense counsel therefore could have provided Dr. Behrouz with Dr. Venkatasubramanian's report.[5] He simply chose not to. Dr. Behrouz can only opine that he has not

---

[4] Dr. Behrouz reviewed the reports from Drs. Christiansen, Bresnahan, Ward, and Guidry as part of his review of the St. Thomas More hospital records, and he was separately given Dr. Leach's report. Exhibit P, p. 7.
[5] Mr. Williams provided defense counsel with Dr. Venkatasubramanian's and Dr. Leach's reports on the same day, July 14, 2017. Exhibit Q. Defense counsel provided Dr. Leach's report to Dr. Behrouz, but not Dr. Venkatasubramanian's.

seen evidence "definitely proving" Mr. Williams had a stroke because defense counsel chose not to give him the evidence that was in counsel's possession. Mr. Havens' estate's choice to steadfastly refuse to acknowledge the uncontroverted medical evidence does not create a triable issue of fact.

Fourth, in his report, Dr. Behrouz never asserts that Mr. Williams did not suffer an ischemic stroke on May 14, 2015, likely because such an assertion would be false. Exhibit P, p. 9-11. Furthermore, Dr. Behrouz's report does not contain any contrary diagnoses of Mr. Williams that might potentially put Mr. Williams' diagnosis in controversy. As a result, Dr. Behrouz's report does not create a factual controversy concerning whether Mr. Williams suffered a stroke.

Element 2: There is no genuine issue of fact that Mr. Havens' delay in having Mr. Williams transported to the hospital to get treatment for his stroke caused Mr. Williams substantial harm.

The expert neurologists for both Mr. Williams and Mr. Havens' estate agree that the facts in this case establish the element of causation. Exhibits N, P. This is because (1) Mr. Havens delayed sending Mr. Williams to the hospital for 30 hours, (2) treatment for a stroke is only effective if given within 4.5 hours of the onset of symptoms, and (3) treatment for Mr. Williams' stroke would more likely than not have reversed his symptoms.

Importantly for the purposes of summary judgment, Dr. Behrouz agrees with Dr. Venkatasubramanian's assessment that the evidence in this case establishes causation. While less expansive on the topic than Dr. Venkatasubramanian, Dr. Behrouz states: "Causation Legal burden of proof met? *Yes*." Exhibit P, p. 9 (emphasis in original).

The facts mandate Dr. Behrouz's concession. First, it is uncontroverted that Mr. Havens did not send Mr. Williams to the hospital on May 14, thereby delaying any treatment for his stroke. On May 13, 2015, Mr. Havens diagnosed Mr. Williams as having suffered a Transient Ischemic Attack (TIA), otherwise known as a "warning stroke," the day before. Exhibit S. Mr. Havens did not order

---

Exhibit P, p. 7. It is therefore incontrovertible that defense counsel could have provided Dr. Venkatasubramanian's report to Dr. Behrouz yet made the strategic choice not to.

a hospital transport at that time. Exhibit S. Mr. Williams then suffered his full-blown stroke at 6:30 am on May 14, 2015. Exhibit L, p. 1. Mr. Havens next saw and evaluated Mr. Williams just before 9:26 am that morning, when he wrote his first report. Exhibit R. In this report, Mr. Havens documented that Mr. Williams had obvious stroke symptoms: left arm numbness and weakness, complete inability to use the left arm, no dexterity in the left hand, slurred speech, unsteady gait, and mental confusion. Exhibit R. After seeing and evaluating Mr. Williams, Mr. Havens wrote that he wanted to get Mr. Williams to the hospital that day, but took no actions to accomplish this. Exhibit R (SMC is an abbreviation for St. Mary Corwin Hospital in Pueblo, CO).

Mr. Havens saw and evaluated Mr. Williams again just before 11:25 am that morning, when he wrote his second report. Exhibit T. In this report, Mr. Havens explicitly stated his knowledge that Mr. Williams was having a stroke (TIA or CVA). Exhibit R. Mr. Havens again stated his desire to get Mr. Williams evaluated, but took no steps to make this happen. Exhibit R. As a result of Mr. Havens' decision not to order the transport, Mr. Williams did not go to the hospital on May 14, 2015, despite the fact that he was having a stroke. Only after a different medical practitioner, Donna Guyett, saw Mr. Williams at 12:39 pm on May 15 did Mr. Havens agree to send Mr. Williams to the hospital. Exhibit U (righthand column, voice order to set up hospital transport by Mr. Havens). This was 30 hours after Mr. Williams suffered his stroke at 6:30 am on May 14.

Second, treatment for a stroke is only effective if given within 4.5 hours of the onset of symptoms. tPA is the only treatment for an ischemic stroke. Exhibit N, p. 7; Exhibit C, p. 46; Exhibit D, p. 36-38; To be effective tPA must be given intravenously within 4.5 hours of the onset of symptoms. Exhibit N, p. 6. When Mr. Havens saw Mr. Williams on May 14, Mr. Williams was within the time window to receive tPA. Exhibit N, p. 6. Mr. Havens' decision not to send Mr. Williams to the hospital therefore prevented Mr. Williams from receiving the only medicine that could have treated his ischemic stroke.

Third, had Mr. Williams received tPA, it is more likely than not that his symptoms would have been reversed. According to Dr. Venkatasubramanian, taking all Mr. Williams' individual factors into account, had Mr. Williams received tPA, there was a 78% chance that he would have had an "excellent functional outcome," and a 60% chance he would have completely returned to normal or had only minimal symptoms. Exhibit N, p. 6-7. There is thus no genuine issue of fact concerning causation: Mr. Havens delayed Mr. Williams' transport to the hospital by 30 hours, preventing him from receiving treatment that would more likely than not have reversed his symptoms.

Instead of receiving the treatment that would have reversed his symptoms, has permanent, lifelong physical deficits. Because of the delay in Mr. Williams' treatment, he was forced to spend twelve days in the hospital attempting to recover. Exhibit H, p. 1 (entered hospital on May 15); Exhibit J, p. 1 (transferred to other portion of the hospital on May 20); Exhibit G, p. 1 (discharged from the hospital May 26). Even after his discharge from the hospital, Mr. Williams had significant physical deficits. Exhibit G, p. 1. These physical deficits are still present today, they greatly impair his ability to function on a daily basis, and they will only get worse over time. Exhibit O, p. 4-5.

<u>Element 3: There is no genuine issue of fact that Mr. Havens knew of and disregarded a substantial risk of harm to Mr. Williams</u>

There is no genuine dispute that Mr. Havens knew Mr. Williams was having a stroke. There is no genuine dispute that Mr. Havens knew a stroke requires immediate transport to the hospital. There is no genuine dispute that Mr. Havens did not order the transport he knew was necessary. There is thus no genuine dispute that Mr. Havens knew of and disregarded a substantial risk of harm to Mr. Williams.

First, Mr. Havens knew Mr. Williams was having a stroke on the morning of May 14, 2015. On May 13 at 10:08 am, Mr. Havens diagnosed Mr. Williams as having recently suffered a TIA, otherwise known as a "warning stroke." Exhibit S. At 10:48 pm on May 13, Mr. Havens reviewed

8

and signed Mr. Mercer's report that Mr. Williams "began having stroke symptoms again approximately 1500 today," though they resolved on their own. Exhibit Z. Then, on May 14, Mr. Havens reviewed and signed Ms. Johnson's 8:34 am report in which she wrote:

> "Mr. Williams came in today claiming symptoms of a stroke. He claims the symptoms 'come and go' throughout the day. . . . When he is having an episode he feels numbness and tingling radiating down the entire left side of his body. He claims his speech is slurred, he experiences dizziness, and he drags his left foot. . . . [Today I observed] his gait was unsteady with a slight limp on his left side. . . . He has a weaker grip strength with his left hand."

Exhibit AA. After conducting his own examination, Mr. Havens wrote at 9:26 am:

> Inmate has been seen many times for similar symptoms of numbness and weakness of the left arm and slurred speech. He has been confused and his gait is unsteady. His vitals have been stable. This am he is unable to use his left arm and his hand has no dexterity. I will try to get him to SMC [St. Mary Corwin Hospital] today.

Exhibit R. He then wrote at 11:26 am:

> Inmate has been seen several times in the last few days and 3 times in the last 48 hours with symptoms of CVA or TIA. He has slurred speech mental confusion and loss of use of his left arm and hand.

Exhibit T. Based on Mr. Havens' own records as well as records he reviewed and signed, there can be no debate that Mr. Havens saw Mr. Williams with obvious stroke symptoms and recognized those symptoms as stroke symptoms.

Furthermore, Mr. Havens had training and experience specifically related to identifying stroke symptoms. This training taught Mr. Havens that Mr. Williams' symptoms were stroke symptoms. Mr. Havens was a Physician's Assistant for over 34 years. Exhibit CC. On May 14, 2015, Mr. Havens was certified in both Basic Life Support (BLS) and Advanced Cardiovascular Life Support (ACLS). Exhibit BB. The classes that underlie ACLS certification teach how to identify and diagnose a stroke. Exhibit W, p. 8. Based on Mr. Havens' ACLS certification, Dr. Tubbs (Mr. Williams' expert on correctional medicine) concluded that Mr. Havens "did in fact know how to diagnose a stroke in progress based on his knowledge base." Exhibit X, p. 1. Even training as basic as CPR training – a training regularly taken by lay people – includes how to identify a stroke. Exhibit

A, p. 56. In addition, public outreach such as radio advertisements or billboards regarding how to diagnose a stroke are prevalent across the country. *See* Exhibit E, p. 47 (stroke diagnosis on radio advertisements). There is thus no genuine dispute that on the morning of May 14, Mr. Havens saw Mr. Williams exhibiting stroke symptoms and identified these symptoms as stroke symptoms.

Second, based on Mr. Havens' ACLS training, there is no question he knew that a stroke requires immediate transport to the hospital. ACLS certification involves learning the American Heart Association's Suspected Stroke Algorithm. Exhibit W, p. 8, 14. Under the Suspected Stroke Algorithm, if a person identifies symptoms of a possible stroke, there is only one thing to do: "Activate Emergency Response." Exhibit W, p. 14. It is also common knowledge among both medical practitioners and lay people that a person suffering a stroke needs immediate medical care at a hospital. Exhibit A, p. 56, 68, 70-71, 178 (nurse); Exhibit B, p. 24 (lay person referring to "FAST" method of stroke evaluation, Exhibit V); Exhibit C, p. 39, 41 (nurse); Exhibit D, p. 36 (nurse); Exhibit E, p. 47 (stroke diagnosis on radio advertisements); Exhibit F, p. 56-57; Exhibit V. *See Mata v. Saiz*, 427 F.3d 745, 752 (10th Cir. 2005) ("if a risk is obvious so that a reasonable man would realize it, we might well infer that [the defendant] did in fact realize it.").

Third, knowing that Mr. Williams required immediate transport to the hospital, Mr. Havens did not order it. All evidence in discovery supports the conclusion that Mr. Havens never took any action to have Mr. Williams transported to the hospital on May 14, 2015. Exhibit C, p. 173, 180; Exhibit D, p. 238-39, 247; Exhibit E, p. 131-32. To the contrary, on May 14 at 12:31 pm Mr. Havens put in a request for Mr. Williams to have an ultrasound sometime within the next week. Exhibit DD. Furthermore, he did this 6 hours after the stroke, well after the window for Mr. Williams to receive tPA had already closed. Exhibit N, p. 6. Mr. Havens took no actions to get Mr. Williams to the hospital during the window when he could have received tPA. Exhibit C, p. 173, 180; Exhibit D, p. 238-39, 247; Exhibit E, p. 131-32. This represented deliberate indifference to Mr. Williams' serious

medical need. Exhibit W, p. 11-12. Even Mr. Havens' own expert on correctional medicine, Dr. Kern, does not opine that Mr. Havens' met the standard of care when he delayed Mr. Williams' transport to the hospital by a day, and he offered no opinion regarding deliberate indifference. Exhibit Y, p. 9. There is thus no genuine factual dispute that Mr. Havens knew Mr. Williams needed to go to the hospital right away but did not order it.

Because there is no genuine dispute of fact as to any element of claim 3, this Court should award summary judgment to Mr. Williams against Mr. Havens' estate.

## II.   Mr. Williams is entitled to summary judgment on claim 7: Negligence

### A.   Burden of proof and elements

Mr. Williams' seventh claim, brought pursuant to Colorado tort law, alleges negligence by Mr. Havens. To prove this claim, Mr. Williams must demonstrate by a preponderance of the evidence that (1) Mr. Havens owed Mr. Williams a duty of care, (2) Mr. Havens breached that duty of care, (3) Mr. Williams suffered injury, and (4) Mr. Williams' injury was caused by Mr. Havens' breach of the duty of care. *Vigil v. Franklin*, 103 P.3d 322, 325 (Colo. 2004).

### B.   No genuine issue of material fact exists regarding the elements of claim 7

<u>Element 1: There is no genuine issue of material fact that Mr. Havens had a duty to provide Mr. Williams with adequate medical care</u>

Colorado law establishes that correctional facilities have a duty to provide medical care to inmates. C.R.S. § 16-3-401(2) ("Persons arrested or in custody shall be treated humanely and provided with adequate food, shelter, and, if required, medical treatment."); *Denver Health & Hosp. Auth. v. City of Arvada*, 2016 COA 12, ¶ 33. Mr. Havens' expert neurologist confirms that this duty exists. Exhibit P, p. 8 ("Duty Legal burden of proof met? *Yes*."). Mr. Havens' estate admitted in its answer that Mr. Williams was an inmate at Fremont Correctional Facility at all times relevant to this case. ECF No. 15 ¶ 11; ECF No. 36 ¶ 11. Mr. Havens' estate also admitted that Mr. Havens was employed by Supplemental Health Care, that through his work for Supplemental Health Care he

11

worked at FCF, and that he treated Mr. Williams at FCF. ECF No. 15 ¶ 14; ECF No. 36 ¶ 14. As a result, Mr. Havens had a duty to provide adequate medical care to Mr. Williams.

Element 2: There is no genuine issue of material fact that Mr. Havens breached his duty to provide Mr. Williams with adequate medical care

Mr. Havens breached his duty to provide adequate medical care to Mr. Williams by not sending Mr. Williams to the hospital for his stroke. As established above, Mr. Havens knew that Mr. Williams suffered a stroke on the morning of May 14, 2015, and he did not have Mr. Williams transported to the hospital in time to receive tPA. *See* part I.B, elements 1, 3, *supra*. According to all four experts who opined on this topic, Mr. Havens' failure to order Mr. Williams' transport to the hospital on May 14, 2015 did not meet the standard of care required to establish adequate medical treatment. Exhibit W, p. 11; Exhibit N, p. 6-7; Exhibit P, p. 8; Exhibit Y, p. 9.

Element 3: There is no genuine issue of material fact that Mr. Havens' breach of his duty to provide Mr. Williams with adequate medical care caused injury to Mr. Williams

As established above, there is no genuine dispute concerning the fact that Mr. Havens' delay in sending Mr. Williams to the hospital caused his damages. *See* part I.B, element 2, *supra*. Experts from both sides agree that Mr. Havens' breach is what caused Mr. Williams' damages. Exhibit N, p. 6; Exhibit P, p. 3.

Element 4: There is no genuine issue of material fact that Mr. Williams suffered injury

Finally, there is no genuine dispute that Mr. Williams suffered a stroke on May 14, 2015. *See* part I.B, element 1, *supra*. Every doctor who treated Mr. Williams concluded he suffered a stroke. *Id*. Dr. Behrouz does not disagree with any of these doctors' findings. Exhibit P. Instead, he invents an incorrect burden of proof, and then opines that the available evidence does not meet it. *See* part I.B, element 1, *supra*. Dr. Behrouz's opinion on whether the evidence he was provided meets an incorrect standard of proof does not put the underlying fact that Mr. Williams suffered a stroke in dispute. *Id*.

Furthermore, even if Dr. Behrouz's opinion were capable of putting the fact of Mr. Williams's stroke in dispute, counsel for Mr. Havens did not provide Dr. Behrouz with the evidence in counsel's possession that would have led Dr. Behrouz to conclude that Mr. Williams had a stroke, even under his incorrect burden of proof. *Id.* Under these circumstances, there is no legitimate dispute that Mr. Williams suffered a stroke. Because Mr. Havens did not have Mr. Williams transported to the hospital in time to receive tPA to treat his stroke, it is undisputed that Mr. Williams suffered a prolonged hospitalization and has permanent physical damages. Part I.B, element 2.

## CONCLUSION

The evidence in this case, viewed in the light most favorable to Mr. Havens' estate, conclusively establishes all the elements of claims 3 and 7 in Mr. Williams Amended Complaint (as well as his pending Second Amended Complaint). Mr. Williams is therefore entitled to summary judgment against the Estate of Roy Havens on claims 3 and 7.

Submitted: August 31, 2017

*s/ Adam Frank*
Adam Frank
Faisal Salahuddin
FRANK & SALAHUDDIN, LLC
1741 High Street
Denver, CO 80218
Telephone: (303) 974-1084
Fax: (303) 974-1085
adam@fas-law.com
faisal@fas-law.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. I further certify that a copy of the foregoing was served via electronic mail through the CM/ECF system, addressed to the following:

Chris Alber, Esq.
Chris.alber@coag.gov

Joe Sanchez, Esq.
jsanchez@goodspeedmerill.com

*s/ Lena Andrews*
Paralegal
FRANK & SALAHUDDIN LLC