**Kennon Tubbs MD**
13584 Carolina Hills Court
Draper, Utah 84020
(801) 502-3473
jailmd@gmail.com

June 6th, 2017

**Adam Frank**
**Frank & Salahuddin LLC**
**1741 High Street**
**Denver, CO 80218**
**Phone: 303-974-1084**
**Fax: 303-974-1085**
**www.fas-law.com**

**In regard to Allen Williams**

Dear Mr. Adam Frank:

    I am a family practice physician and have practiced at the Utah State Prison for 16 years. I am currently the Medical Director for ten county jails throughout Utah and Wyoming. I am a certified provider by the National Correctional Commission on Health Care (CCHC-P). I supervise three Physician Assistants who provide the majority of patient care at these facilities and have extensive experience with providing patient care and medical supervision of correctional facilities. I understand the expectation of care to be provided by nursing staff, mid level providers, and physicians in the correctional setting. As part of my experience and work history, I understand and regularly apply the National Commission on Correctional Health Care standards for health services in jails.

    I have reviewed the records of Mr. Allen Williams. These include the following:



1

1. Fremont Correctional Facility medical records 9 pages

2. St. Thomas More Hospital medical records 331 pages

3. Colorado Department of Corrections Ambulatory Health Record 76 pages

4. AR 700-02 regarding ER transport 13 pages

5. Havens request for carotid ultrasound of neck. 1 page

6. Fremont County Facility records 10 pages

7. Fremont County Deputy written incident report. 8 pages

8. CT scans and imaging reports St. Thomas More Hospital

9. Nursing Protocols for Colorado Department of Corrections

10. Colorado Department of Corrections Nursing Job Descriptions

11. Consult request from Mr. Havens for Ultrasound

I have the expertise to evaluate the accuracy and reliability of these records. These records are the type usually relied upon by reviewers such as myself. These records appear to be reliable. As correctional medicine becomes increasingly complex it is important for reviewers, like myself, to keep the documented interaction between a patient, healthcare institution, and providers at the heart of the review process. While it is true to some extent all patient interactions are unique, there are specific medical practices a nursing staff and the treating provider would be expected to provide to meet the applicable standard of care. I have specifically reviewed these records to determine whether, within a reasonable degree of medical certainty, the standard of care was met with respect to treatment of Mr. Williams while incarcerated at the Colorado Department of Corrections. I have also evaluated the records as to whether the available evidence indicates that the nurses and providers involved exhibited

deliberate indifference to Mr. Williams's serious medical need. The above records disclose the following facts in summary:

Mr. Williams was a 72 year old male with a health history of cardiac disease, poorly controlled diabetes, hypercholesterolemia and hypertension. He had three heart attacks and subsequently underwent a coronary artery bypass surgery in 2005 due to his multivessel atherosclerosis. He was taking medications for each one of these diseases. He also had a past medical history for myocardial arrhythmias in which he received a pacemaker to control his cardiac rhythm.

On May 12th, 2015 at 12:45 Williams self declared an emergency. He was referred to the medical department and was triaged by Ricky Mercer R.N. at 13:04. Williams reported to Mercer, "*acute onset of dizziness and left arm numbness. His cellmate told him his speech was slurred. Complaints of weakness and lightheadedness. That he is concerned he is having a stroke.*" No neurologic assessment of gait or motor strength or speech pattern was documented by the nurse at that time. Mercer's assessment was "*abnormal EKG findings and orthostatic hypotension*".

On May 12th, 2015 at 15:37, Mercer entered a note into the chart with a reassessment of Williams. A more thorough neurologic assessment is completed and reported as normal. "*Speech clear and concise, steady gait, oriented times three and no signs of distress*". Mercer reported that the EKG was abnormal due to the prior pacemaker and bypass graft with multiple prior myocardial infarctions. Mercer reported findings to Trudy Sicotte Nurse Practitioner. Sicotte agreed with the nursing protocol for dizziness (vertigo) and ordered a nursing

3

reevaluation at 19:30 and to encourage oral fluids for rehydration. Williams was asked to report any new symptoms.

On May 12th, 2015 at 21:44 Mercer reevaluated Williams. Williams reported, "*Still feeling dizzy but speech has been clear and numbness in the left arm has resolved.*" Mercer observed that Williams was in no distress. No follow up was ordered and Williams was instructed to continue to drink fluids.

On May 13th, 2015 at 10:08 Williams was seen by Roy Havens P.A. Havens reported that Williams was being seen for a reported "*TIA*" and was "*doing better*". Williams was instructed to follow up in a week. No other orders were made at this time.

On May 13th, 2015 at 22:48 Mercer was called to evaluate Williams again. Williams reported to Mercer, "*stroke symptoms again at 1500 with reported left arm numbness. Cellmate reported his speech was slurred and he had trouble walking for 30 minutes. He had a headache briefly but it has now resolved.*" Mercer objectively noted a normal neurological exam and normal speech. He had Williams sent to medical to be evaluated for 2 hours in which no symptoms returned so he was released back to his housing. Mercer contacted Havens with a report and the verbal order by Havens was to have Williams evaluated in the morning for consideration of pacemaker and carotid ultrasound evaluation. On May 14th, 2015 at 08:34 Williams was brought to the medical unit by wheelchair. He was evaluated by Nurse Jodi Johnson RN. Williams stated he had been having symptoms of a stroke that "come and go" throughout the day. Williams noted numbness and tingling down the entire left side of his body. His speech was slurred and experiencing dizziness. He reported a new complaint of dragging his left foot. Objectively the nurse stated, "*his gait was unsteady with a slight limp on his left side.*

4

*Speech was clear but a weaker grip strength on the left hand. Both upper and lower extremities have strong strength and reflexes." "Inmate is to wait in the clinic until the provider arrives at 09:30 this A.M."*. No other plan, assessment, or orders were obtained. A provider was not contacted at this time.

On May 14th, 2015 at 09:26 Havens evaluated Williams. Havens writes, *"Inmate has been seen many times for similar symptoms of numbness and weakness of the left arm and slurred speech. He has been confused and his gait is unsteady. His vitals have been stable. This AM he is unable to use his left arm and his hand has no dexterity. I will try to get him to SMC today."* His assessment is essential hypertension, abnormal EKG, and diabetes without complications. <u>**There is no plan that is documented. EMS is not activated, No nursing orders, diagnostic studies, medications, or hospital transfer is ordered.**</u>

On May 14th, 2015 at 11:25 Havens reports that Williams has *"been seen several times over the last 48 hours with symptoms of a CVA or TIA. He has slurred speech, mental confusion, and loss of the use of his left arm and hand."* Havens orders an outpatient Carotid Ultrasound to be done within a week timeframe and orders a wheelchair clearance for two weeks.

On May 15th, 2015 at 12:39 Williams is evaluated by Nurse Donna Guyett RN. The observations included, *"increased difficulty walking, left facial droop, unable to move left side of face and biting cheek, slurring speech, unsteady with ambulation and dragging left foot."* Guyett contacted Havens with this report and was ordered to send Williams to St. Thomas More Hospital for emergent evaluation. Emergency Medical Services, EMS, was not contacted and ACLS Stroke protocol was not instituted. Williams was sent to the Emergency Room by regular prison van transport at 13:15.

5

On May 15th, 2015 at 14:06 Williams arrives at STM hospital and is triaged. A stroke protocol is began and a CT scan is ordered at 14:13 by Dr. Ryan Christiansen MD. CT findings rule out hemorrhagic stroke and confirmed a **Right middle cerebral artery embolic stroke**. Williams was evaluated for consideration for anticoagulation therapy. It was determined that due to the time frame that Williams was not a candidate for thrombolytic therapy due to the duration of his symptoms of thirty hours. Dr. Timothy Bresnahan MD was contacted for consult. Williams was admitted to the hospital for stroke protocol evaluation and workup. A carotid ultrasound was then ordered at 17:03.

On May 20th, 2015 at 12:30 Williams was transferred to SWING status and intermediate care. He received post stroke evaluation with physical therapy, occupational therapy under the guidance of Sandra Guidry MD. He was admitted for complete flaccid left upper extremity paralysis and partial lower extremity paralysis. He was inpatient and underwent stroke rehabilitation at St Thomas More hospital for 11 days.

On May 26th, 2015 Williams was discharge back to the correctional facility with chronic deficits due to the stroke. Upon discharged from the hospital he was noted to have a, "*deep flaccid paralysis of his left upper extremity which is essentially non functional. His speech issues had markedly improved.*"

## Discussion:

### Stroke

Acute ischemic stroke is an emergency. Approximately 2 million neurons are lost during each minute of stroke. Intravenous tissue plasminogen activator improves the likelihood of a good outcome. However, benefit is heavily time dependent. Patients treated within 90 minutes of

symptom onset have better outcomes than those treated beyond that point. Rapid evaluation and emergency management are key, and a minimum number of tests should be obtained before management. Different imaging studies, including computed tomography, Magnetic Resonance Imaging (*MRI*), computed tomographic angiography, magnetic resonance angiography, and perfusion studies, are useful for evaluation of acute stroke.

On May 12th Williams complained that he thought he was having a stroke. Williams reported symptoms that were consistent with a Cerebrovascular Accident (CVA) or Transient Ischemic Attack (TIA). He reported slurring speech and weakness which are suggestive of a stroke but not for vertigo. Acute neurologic change and stroke-like symptoms require emergent evaluation. When any health care personnel becomes aware that:

1.) A patient is having a stroke in progress;

2.) The patient complains of stroke-like symptoms;

3.) The patient has recent complaints of stroke like symptoms within the last 24 hours that have resolved and has multiple stroke risk factors such as age over 70, prior cardiovascular disease, prior athrosclerotic disease, smoking history, hypercholesterolemia, hyperlipidemia, diabetes, hypertension, or decreased physical activity; or

4.) Personnel suspects a possible acute stroke; then

5.) EMS should be contacted immediately and the patient receives "*front of the line care*".

Williams had significant risk factors of stroke which included age of 72, prior vascular disease, myocardial infarction times three that required a coronary artery bypass surgery,

uncontrolled diabetes, hypertension, hypercholesterolemia, and a smoking history. He was told by nursing staff that this was a vertigo issue. Vertigo does not cause speech disturbances. The nursing protocol for vertigo was done. The Colorado Department of Corrections did not provide a protocol for stroke for review, though it is likely they they follow the ACLS stroke protocol put forth by the American Heart Association (*see attached*). All nursing staff and providers should be trained in ACLS protocols and emergent stroke management. ACLS protocol for cerebrovascular compromise requires emergent evaluation. A stroke should have been ruled out prior to diagnosing Williams with "vertigo" since acute neurologic complaints in a patient with multiple risk factors requires further investigation. Conservative management is never recommended in evaluation of acute neurological change. Staff should have activated the ACLS Cerebrovascular protocol immediately to investigate these recognized complaints that were attributed to a stroke by Havens.

Williams met criteria for an acute evaluation on May 12th but was not triaged emergently. Appropriate management would have been activation of the EMS/ACLS Stroke protocol and emergent evaluation with a CT scan or MRI. By failing to order the appropriate care, Trudy Sicotte, NP failed to meet the applicable standard of care. The medical staff had multiple subsequent opportunities to begin the ACLS protocol but for unknown reasons made a decision not to. On May 13th Williams was seen by a provider but no emergent CT scan, MRI or urgent imaging was scheduled.

On May 14th at 08:30 Johnson RN is specifically deliberately indifferent to Williams' acute neurologic needs. When Johnson evaluated Williams, she did not attempt to do a full nursing assessment which would have included a NIH stroke scale or Canadian Neurological

8

scale. Johnson charted significant neurologic findings but did not activate EMS or contact the provider immediately. She ordered Williams to wait for one hour to be seen by the provider. She did not attempt to provide Williams with any type of emergent care that, as a nurse, she knew was required.

Havens was also deliberately indifferent to Williams complaints that he was "*having a stroke*," and made no plans for emergent or urgent evaluation. When Havens evaluated Williams at 09:28 he confirmed the acute neurologic changes. He stated in his chart note, "*try to get him to STM today.*". The records shows no evidence Havens acted on his claimed intent to have Williams evaluated that day. At 12:31 on May 14th, three hours after Havens evaluated Williams, Havens ordered a consult for carotid ultrasound to be done within one week. Havens made no attempt to contact EMS or activate the ACLS stroke protocol. Havens did not order the nursing staff to follow the patient in any way throughout the day. Havens did not order an emergent CT or hospital transfer. There was adequate time to provide thrombolytics if action would have been taken at 08:30am or 09:30am on May 14th. It is unclear if Havens, Johnson or any of the nursing or provider staff are ACLS certified. It is an industry standard, due to the nature of long term care being provided in a correctional setting, that medical staff are certified in ACLS. Everyone who is ACLS certified would have specialty training in stroke evaluation. Therefore the obvious complaints, signs and symptoms of acute neurologic change that were noted by multiple staff members should have activated an emergent stroke protocol. Even basic life support certification, BLS/CPR, covers the 'FAST' method of stroke evaluation which would require emergent transport to the hospital. However, no staff member attempted to contact EMS for emergent evaluation and hospital transport.

9

Havens made no follow up plan for Williams on May 14th. He did not make further orders for Williams to have nursing care. He planned no immediate follow up. He did not contact his attending physician to report a stroke in progress. He made no attempt to emergently evaluate Williams and it is this lack of care that extends past negligence and into the realm of deliberate indifference, as no attempt to provide emergent care was made by Havens.

It is not clear in the records at to what happened to Williams over the next 30 hours. He did not receive medical evaluation or charting during that time. When Guyett followed up with Williams at 12:39 on May 15th, 2015, his symptoms had worsened. Guyett did not do a qualified stroke assessment but noted significant neurologic deficits and contacted Havens appropriately to have Williams sent to the hospital. When the order was finally given by Havens, Guyett did not contact EMS. All patients with stroke symptoms and acute neurologic change should be evaluated emergently because time is of the essence. It is unclear in the records who decided to transfer the patient by prison van, but this is not the standard of care for a stroke in progress. Williams continued to have worsening and progressive symptoms when he was evaluated by Guyett. EMS should have been activated and a stroke protocol should have been implemented. Due to the prison van transport decision a van was ordered at 12:39 and Williams departed the prison at 13:15. He arrived at the hospital at 14:06. Transportation to the hospital took 87 minutes. Had EMS been appropriately contacted the transportation time would have been significantly altered. If the Colorado Department of Corrections sends every stroke patient to the emergency room by van then no patient will ever qualify for thrombolytic therapy due to these inappropriate delays in transportation care for evaluation of acute stroke. The decision to

transport by van is negligent as it is assumed that life flight or ambulance would have shortened the time frame. This review did not evaluate the entire transportation process.

# Expert Opinion

It is my professional opinion that the Colorado Department of Corrections (through the health care professionals it contracted with namely, Roy Havens PA., Jodi Johnson RN) were deliberately indifferent to Williams' serious acute neurologic medical need and willfully deviated from the standards for health services in a correctional setting. Therefore, the medical care that was provided at the prison was untimely and inadequate to treat his serious medical condition. This opinion is supported by:

1. Jodi Johnson RN's failure to appropriately and timely refer and treat the early deterioration episode and stroke progression of a right middle cerebral artery occlusion on May 14th, 2015 at 08:30am.

2. Roy Havens PA's failure to appropriately and timely refer and treat the early deterioration episode and stroke progression of a right middle cerebral artery occlusion on May 14th, 2015 at 09:29am.

3. Havens' and Johnson's failure to activate ACLS protocols for stroke at any time despite direct knowledge of an acute stroke in progress.

4. Havens' and Johnson's failure to comply with National commission on correctional health care, NCCHC, standard J-A-07 "Emergency Response Plan." This standard states that an emergency affecting one individual who is in need of immediate medical intervention requires activation of the Emergency Response

plan. Stroke in progression requires activation of the Emergency Response Plan. No emergency was instituted in the stroke care of Williams.

5. Havens' and Johnson's failure to provide access to care. *"Access to care means that in a timely manner, a patient can be seen by a clinician, be given a professional clinical judgement, and receive care that is ordered."* **NCCHC standard J-A-01 essential.** This is the standard that all jail health care is based on. Had Williams not been incarcerated he would have gone to the emergency room on May 12th, 2015 when he first experienced symptoms of a stroke. Williams was not able to access the emergency room in an appropriate time frame. The emergency department is the only facility that is equipped to handle a stroke in progress.

It is also my professional opinion that the Colorado Department of Corrections (through the health care providers it contracted with and employed, namely, Trudy Sicotte and Donna Guyett) was negligent in the care provided to Williams. This opinion is supported by:

1. Guyett's failure to order transport in an emergent manner via ambulance and intentionally delaying access to care of the emergency department.

2. Sicotte's failure to recognize recent stroke symptoms with the multiple risk factors for stroke and refer for emergent evaluation on May 12th and acceptance of the diagnosis of vertigo from the nurse as the root cause without further workup as to the 30 minutes of slurred speech complaint.

## Conclusion

Based upon a reasonable degree of medical certainty, it is my opinion that the Roy Havens, Jodi Johnson, Trudy Sicotte, Donna Guyett, the Colorado Department of Corrections and the appointed health care authority for the prison did not provide timely, adequate, prudent, and necessary care as required in a correctional setting. It is my opinion that these breaches in care caused a delay in the treatment of Allen Williams' cerebrovascular accident. As a direct and proximal result of the inadequate care provided by the prison's medical staff, Williams suffers from a permanent lack of mobility, altered gait, and upper extremity weakness and permanent neurologic deficits. In particular the deliberate indifference of Johnson and Havens to an acute neurologic event in progress is of significant concern. It is deliberate indifference when Havens charted that he would "*try to get him to SMC today*" but made no apparent effort to contact EMS or St. Thomas More hospital. Havens recognized the patient's neurological deficits and knew the patient needed emergency hospital care but did not provide hospital transport at that time. He made no plans for further evaluation of Williams over the next 27 hour period. This constitutes deliberate indifference. The care provided by Sicotte and Guyett was negligent and did not meet the industry standard but did not rise to the level of deliberate indifference as they did attempt to provide care.

Thank you for allowing me to opine on this case. I reserve the right to amend this report if new information becomes available.

Kennon C. Tubbs M.D.

*[signature: Kennon C Tubbs MD]*




https://stroke.nih.gov/documents/NIH_Stroke_Scale.pdf

http://www.strokeassociation.org/STROKEORG/AboutStroke/UnderstandingRisk/Understanding-Stroke-Risk_UCM_308539_SubHomePage.jsp