IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger

Civil Action No. 16-cv-02773-MSK-CBS

ALLEN WILLIAMS,

    Plaintiff,

v.

RICKY MERCER,
DONNA GUYETT, and
JOHN DOE DEFENDANTS 1-10,[1]

    Defendants.

## OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

**THIS MATTER** comes before the court upon Defendants Donna Guyett and Ricky Mercer's (the "State Defendants") Motion for Summary Judgment (#**62**), Mr. Williams's Response (#**68**), and the State Defendants' Reply (#**74**).[2]

---

[1]     This action having been pending for more nearly two years without identification of, much less service of process upon, the John Doe Defendants, the Court dismisses the claims against those Defendants pursuant to Fed. R. Civ. P. 4(m) and 41(b).

[2]     As the Court was preparing to docket this Order, the parties filed a Notice of Settlement **(# 79)** that reflected that "final settlement and dismissal paperwork will be filed upon completion." Pursuant to MSK Practice Standards (Civil) 16.6(a)(1) and (2), the filing of a "notice" of a settlement that will be completed in the future – *compare to* settlement papers authorizing immediate dismissal of claims or otherwise providing from the immediate closure of the case– does not operate to vacate any deadlines or otherwise affect the Court's evaluation of pending motions. Because the parties' Notice of Settlement anticipates further filings at some point in the future, the Court construes the parties' settlement as incomplete at this point in time and thus, the Court proceeds to rule on the summary judgment motion.

1

In Mr. Williams' response, he states that he "will no longer pursue claims against Mr. Mercer." Thus, the Court deems Mr. Williams to voluntarily dismiss all claims against Mr. Mercer and the Court considers only the remaining claims against Ms. Guyett.

## JURISDICTION

Mr. Williams brings claims under 42 U.S.C. § 1983 and state law, and the Court exercises jurisdiction under 28 U.S.C. §§ 1331 & 1367.

## FACTS

The following facts are undisputed unless attributed otherwise, and treated in the light most favorable to the non-moving party.

The events underlying this case date to May 2015, when Mr. Williams was incarcerated at the Colorado Department of Corrections' (CDOC) Fremont Correctional Facility (FCF), in Cañon City, Colorado. He was then 72 years old and had Type 2 diabetes, hypertension, hyperlipidemia, and a history of cardiac illness including bypass surgery in 2005, a pacemaker, and multiple prior heart attacks. In this lawsuit, he alleges that he suffered a series of transient ischemic attacks ("TIA"s) or "warning strokes," followed by an ischemic stroke (also known as a cardiovascular accident or "CVA"), and that he was denied timely medical treatment including transfer to a hospital by the Defendants, all of whom were medical providers at FCF.

On May 12, 2015, at approximately 1:00 p.m., Mr. Williams walked into the FCF medical clinic and was seen by Ricky Mercer, a registered nurse employed by CDOC. Also present was Trudy Sicotte, a nurse practitioner employed by CDOC contractor Supplemental Health Care ("SHC"). Mr. Williams reported that he had experienced dizziness and left arm numbness beginning about fifteen minutes before, that his cellmate had indicated his speech was slurred, and that he was afraid he was having a stroke. Mr. Mercer examined Mr. Williams, but

2

observed no current or continuing symptoms.  Mr. Williams was told to return to the clinic later that day for further evaluation.  When he did so, he reported that was still feeling dizzy but had not had further numbness or slurred speech.  Mr. Mercer evaluated Mr. Williams further, then returned him to his cell with instructions to report new or worsening symptoms to the medical clinic.

     Mr. Williams returned to the clinic the next morning, May 13, 2015.  He was seen by Roy D. Havens, a physicians' assistant employed by SHC.  Mr. Havens documented that Mr. Williams had returned to the clinic "as a follow up from an episode from what appears to be a TIA," but was then "doing bet[t]er," and should be checked again in about a week.  Later that day, first responders were called to Mr. Williams's cell and transported him back to the clinic, where he was again seen by Mr. Mercer and Mr. Havens.  He reported that beginning around 3:00 p.m, "he had begun having stroke symptoms again," including left arm numbness, slurred speech, and difficulty walking. Mr. Mercer kept him in the clinic for approximately 2 hours for observation, during which time Mr. Mercer did not observe further objective symptoms other than an increase in Mr. Williams's blood pressure.  Mr. Williams was returned to his cell and directed to return the next day for re-evaluation and possible referral for a carotid artery ultrasound and pacemaker check.

     Mr. Williams was returned by wheelchair to the clinic shortly after 8:00 a.m. on May 14, 2015, reporting "symptoms of a stroke."  He was examined by Jodi Johnson, who observed that Mr. Williams had an unsteady gait and slight left side limp, as well as weaker grip with his left hand, but also that his vital signs were within normal limits and he had no facial drooping.  After consulting with the charge nurse, Ms. Johnson had Mr. Williams wait in the clinic for a "provider" to arrive, namely, Mr. Havens.  Mr. Havens arrived at approximately 9:26 a.m. and

3

evaluated Mr. Williams, charting he had "been seen many times for similar symptoms of num[b]ness and weakness of the left arm and slurred speech. He has been confused and his gait is unsteady, [h]is vitals h[a]ve been stable. This a.m. he is unable to use his left arm and his hand has no dexterity. I will try to get him to [the hospital] today." Approximately two hours later, Mr. Havens saw and evaluated Mr. Williams again, charting that he "has been seen several times in the last few days and 3 times in the past 48 hours with symptoms of CVA or TIA. He has slurred speech mental confusion and loss in use of his left arm and hand. He has a pacemaker which he has had for several years. Last pacer check is not known to the inmate but his chart shows it was done in Jan. 2015. He is diabetic and is very poorly controlled. I would like to get him evaluated." Mr. Havens also noted Mr. Williams should be seen at the hospital for an ultrasound. He prepared an additional report at approximately 12:31 p.m., repeating the same information and noting his concern that Mr. Williams might have carotid artery lesions.

At approximately 2:22 p.m., Defendant Donna Guyett, a CDOC registered nurse, prepared an entry in Mr. Williams' medical records recapping his earlier evaluations by Ms. Johnson and Mr. Havens, and indicating that Mr. Havens had given a verbal order for Mr. Williams to use a wheelchair. Mr. Williams was again returned to his cell.

The next day, at approximately 12:46 p.m., Ms. Guyett saw Mr. Williams for re-evaluation. She noted he was experiencing left-sided weakness and difficulty walking, had a facial droop and was unable to move the left side of his face, had been biting the inside of his mouth, was "minimally" able to move his arm, was dragging his left foot and slurring his words. Ms. Guyett arranged to have Mr. Williams transported to a hospital by van. He remained in the hospital for eleven days, until May 26, 2015. Hospital discharge notes reflect that on admission he was not considered a candidate for tissue plasminogen activator or "tPA" – a medication that,

4

if used promptly after a stroke event, can reduce the extent of permanent damage -- "due to [the] length of time from event."  The same records state that "a CT scan confirmed a [right middle cerebral artery] embolic stroke with left-sided residual," and hospital records dated May 21, 2015 note that Mr. Williams suffered an "[a]cute ischemic right middle cerebral artery (MCA) stroke."

Given the foregoing sequence of events, Mr. Williams contends that he suffered a series of TIAs on May 12-13, 2015 and suffered an ischemic stroke on the morning of May 14, 2015.

## ANALYSIS

### A. Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  *See White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Substantive law governs what facts are material and what issues must be determined.  It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof, and identifies the party with the burden of proof.  *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).

A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus. Inc. v. Arvin Indus. Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

### B. Eighth Amendment Claims

The Eighth Amendment requires jail officials "to provide humane conditions of confinement by ensuring inmates receive the basic necessities of adequate food, clothing, shelter, and medical care and by taking reasonable measures to guarantee the inmate's safety." *Barney v. Pulsipher*, 153 F.3d 1299, 1310 (10th Cir. 1998). It is well established that prison officials violate the Eighth Amendment if their deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish an Eighth Amendment violation, an inmate must show: (i) that he was suffering from a "serious medical need" – that is, a need that an objective medical provider would recognize as posing a risk of substantial harm to the patient if left untreated; and (ii) that the defendant was "deliberately indifferent" to that medical need, in that the defendant was

6

consciously aware of the need but nevertheless choose not to take any meaningful treatment action in response. *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001); *Self v. Crum*, 439 F.3d 1227, 1230–31 (10th Cir. 2006). Deliberate indifference does not require a showing of express intent to harm, rather, it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm. *Mata v. Saiz*, 427 F.3d 745, 752 (10th Cir. 2005); *see also Farmer v. Brennan*, 511 U.S. 825, 836 (1994).[3] However, a claim based on an inadvertent failure to provide adequate medical care or alleging that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. *Self*, 439 F.3d at 1230.

A prison medical professional who serves solely as a "gatekeeper" – that is, a person who may not provide treatment him- or herself but who controls whether the inmate will be directed to someone else who will provide treatment -- may be held liable under the deliberate indifference standard if he or she deliberately delays or refuses to fulfill that gatekeeper role. *See Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000).

   1.   Qualified Immunity

Ms. Guyett invokes the doctrine of qualified immunity. Qualified immunity protects individual state actors from civil liability if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

---

[3] The parties urge adoption of a third element to the deliberate indifference standard that requires the plaintiff to show he was substantially harmed by any delay in treatment. But this inquiry is actually a component of the first element, a tool to help the Court determine whether a delay in treatment objectively constituted a sufficiently serious condition. *See Redmond v. Crowther*, 882 F.3d 927, 939 (10th Cir. 2018) ("The objective component requires showing the alleged injury is sufficiently serious. A delay in medical care is only sufficiently serious if the plaintiff can show the delay resulted in substantial harm." (internal quotations omitted)); *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000).

*Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012). When a defendant invokes the doctrine of qualified immunity, the burden shifts to the plaintiff, who must: (1) show facts that "make out a violation of a constitutional right," and (2) establish that, at the time of the conduct at issue, it was clearly established under existing law that the defendant's conduct breached the constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The Court may address these questions in whichever order is best suited to the case. If the plaintiff fails to satisfy either prong of this inquiry, the Court "must grant the defendant qualified immunity." *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001). However, if the plaintiff establishes the violation of a clearly established right, it becomes the defendant's burden to prove there is no genuine issue of material fact and that she is entitled to judgment as a matter of law. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).

For all practical purposes, the first question – articulation of a constitutional violation -- is indistinguishable from the inquiry that the Court would make in determining whether the Plaintiff has come forward with sufficient evidence to establish a *prima facie* claim in accordance with Fed. R. Civ. P. 56. The plaintiff must show sufficient evidence to demonstrate the existence of a cognizable claim. The Court considers the evidence in the light most favorable to the non-moving party and assesses whether it is sufficient to demonstrate the violation of a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

The "clearly established" inquiry focuses on whether the contours of the constitutional right were so well-settled in the context of the particular circumstances, that a "reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). To satisfy this prong, the burden is on the plaintiff to point to Supreme Court or Tenth Circuit precedent (or the clear weight of other circuit courts) that

recognizes an actionable constitutional violation in the particular circumstances presented. *Schwartz v. Booker*, 702 F.3d 573, 587–88 (10th Cir. 2012); *see also Thomas*, 607 F.3d at 669 (plaintiff bears the burden of citing to requisite authority). It is not necessary for the plaintiff to point to a case with identical facts, but he must identify some authority that considers the issue "not as a broad general proposition," but in a "particularized" sense — for example, it is not sufficient to ask whether it is "clearly established" that the Fourth Amendment prohibits the use of excessive force in effecting an arrest; rather, the court examines whether that constitutional principle has previously been found to prohibit particular conduct. *See, e.g.*, *Brosseau v. Haugen*, 543 U.S. 194, 198–200 (2004).

      2.      Analysis of Eighth Amendment Violations

Mr. Williams essentially pleads two deliberate indifference claims against Ms. Guyett. In the third cause of action, he claims that Ms. Guyet was deliberately indifferent after he "suffered a full-fledged stroke." In his fifth cause of action, he pleads that Ms. Guyett was deliberately indifferent in her entire course of conduct.[4]

Ms. Guyett, a CDOC registered nurse, had two relevant contacts with Mr. Williams. First, she made an entry in Mr. Williams's medical records on the afternoon of May 14, 2015, documenting that Mr. Havens had given an order for Mr. Williams to use a wheelchair. This cannot support a deliberate indifference claim. Ms. Guyett's uncontradicted testimony is that she was not in charge of Mr. Williams's care, did not assess him herself, and was not part of his care on May 14, 2015, other than to chart the wheelchair order. The fact that she reviewed and

---

[4] In the fourth and sixth causes of action, Mr. Williams pleads conspiracy claims corresponding to each of these deliberate indifference claims. These are addressed separately below.

documented the prior assessments made by Ms. Johnson and Mr. Havens is not enough to establish her own subjective disregard of Mr. Williams's condition. Moreover, as Mr. Williams recognizes, she was acting in a "gatekeeper" role. *See Sealock*, 218 F.3d at 1211. But the medical provider to whom she would have sent Mr. Williams for further assessment or treatment was Mr. Havens, who had already assessed and taken charge of his course of care. Finally, while Mr. Williams argues a jury might conclude that Ms. Guyett *did* see Mr. Williams to assess him – simply because she was in the clinic at the same time -- that is mere conjecture, not sufficient to raise a *genuine* dispute as to whether she observed or treated Mr. Williams that day, contrary to her own testimony that she did not. *See Champagne Metals v. Ken–Mac Metals, Inc.*, 458 F.3d 1073, 1084 (10th Cir. 2006).[5]

Ms. Guyett's second contact with Mr. Williams was on May 15, 2015, when she examined him around 12:30 p.m. Given his symptoms at that time, she advised Mr. Havens that he needed to be transported to a hospital. Her decision to have Mr. Williams transferred to the hospital cannot establish deliberate indifference. And, while Mr. Williams argues she may be held liable for choosing to have him transported by van, rather than by ambulance, thus delaying his arrival, this choice of transport at most reflects negligence or a clinical misjudgment, not recklessness or deliberate indifference to his needs. Thus, Ms. Guyett is entitled to summary judgment on Mr. Williams' claims.

---

[5] To the extent Mr. Williams argues Ms. Guyett was obligated to have Mr. Williams hospitalized based on her own review of the assessments already documented by Mr. Havens and Ms. Johnson, he cannot defeat Ms. Guyett's assertion of qualified immunity. He cites no *particularized* case law reflecting a clearly-established right to have a less qualified medical provider independently undertake a new assessment or second-guess the assessment and course of care already directed by a more qualified provider. *See, e.g.*, *Perry v. Durborow*, ___ F.3d. ___, 2018 WL 2925202, at *5 (10th Cir. June 12, 2018); *Sealock*, 218 F.3d at 1211.

B.  Conspiracy Claims

In his fourth and sixth causes of action, Mr. Williams pleads under § 1983 that Ms. Guyett conspired with others to delay his treatment. Ms. Guyett moves summary judgment on these claims.

To prevail on a § 1983 conspiracy claim, a plaintiff must allege specific facts establishing an agreement and concerted action among the defendants. *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998). Direct or circumstantial proof of a meeting of the minds or agreement among the defendants is required. *Salehpoor v. Shahinpoor*, 358 F.3d 782, 789 (10th Cir. 2004). In addition, a plaintiff must prove an actual deprivation of a right. *Dixon v. City of Lawton, Okla.*, 898 F.2d 1443, 1449 (10th Cir. 1990).

Mr. Williams has not come forward with any meaningful evidence of an agreement among Ms. Guyett and any other individual. He opposes summary judgment based on evidence that Ms. Guyett and others worked together in providing medical care in the FCF clinic. This is insufficient for a reasonable jury to find any of the necessary elements of a § 1983 conspiracy claim, including that any combination of individuals reached an agreement to violate Mr. Williams's constitutional rights. *See Champagne Metals*, 458 F.3d 1084; *Salehpoor*, 358 F.3d at 789. Thus, Ms. Guyett is entitled to summary judgment on Mr. Williams' conspiracy claims.

## CONCLUSION

For the foregoing reasons, the State Defendants' Motion for Summary Judgment (#**62**) is **GRANTED IN PART and DENIED AS MOOT IN PART**. Specifically, the Motion is **GRANTED** as to all remaining claims against Defendant Donna Guyett, and the Clerk of the Court shall enter judgment in favor of Ms. Guyett on all claims. The motion is denied as moot as to Mr. Mercer, against whom the Court construes Mr. Williams to have dismissed all remaining

11

claims. All remaining pending motions in this case are denied as moot. There being no remaining claims in this action, the Clerk of the Court shall close this case.

Dated this 27th day of September, 2018.

**BY THE COURT:**

Marcia S. Krieger
United States District Court